Good morning, and may it please the court, Alison Fisher Silvers, pro bono counsel for Ms. Suradi. Today I'm here with Ryan Chin, a student at UCLA School of Law, and we will be splitting our time. We'd like to reserve two minutes for rebuttal, Your Honor. The uncontroverted evidence demonstrates that local government officials are both unwilling and unable to protect Suradi from being honor killed by her husband if she's forced to return to Jordan. When Suradi went to both the mayor of her hometown, as well as the local police, to report her husband's issues. It's not quite the standard, is it? We're here on a CAT claim, right? Yes, we're here on a CAT claim. Unwilling and unable is a asylum claim, right? Well, under... For a CAT claim, you have to have actual complicity. For the CAT claim, the standard is government acquiescence, and under Inela Chavez... It's always good to focus in on the correct standard. Well, the correct standard that this court has held is that officials remain willfully blind to the torture, or simply stood by because of their inability or unwillingness to oppose it. And that's for Inela Chavez. Okay, where is the unable part? You said unable or unwilling. Let's focus on the unable. How is the government unable? Yeah, no, no. You just read the standards from Inela Chavez, and you were saying that, I think you were arguing that that's the same as unwilling and unable, which is what you started out saying, the standards. So I'm not focusing on the unable. Okay, just focus on unable. You know what unable means? They can't do anything about it. So go back to the standard you read me from Onassis, and where is the unable part? It's the inability and unwillingness to intervene. So I'll rephrase it, as inability and unwillingness to intervene. And when Sorati went to both the mayor of her hometown, as well as the local police, they told her- I'm sorry, how can you have inability and unwillingness? Your Honor, that's this court's standard under Inela Chavez. That's at page 1060 of that case. Doesn't make sense, does it? It makes sense to me that remaining willfully blind, or simply standing by because of their inability or unwillingness to oppose the government's, the torture that's happening at the hands of private parties. But isn't the evidence in the case that the government agents are really concerned with political prisoners and terrorists? They're the ones that- Well, Your Honor, I would like to- That is what the government argues with respect to whether the government will torture Sorati. But today we wanted to focus on the honor killings. And that claim is about her husband who has threatened to kill her if she's returned to Jordan for bringing shame to his family. So then we're dealing with private parties here. So we're not talking about the torture in the prisons, but the torture at the hands of her family members. What about the evidence that the government prosecutes people who engage in honor killings? There was evidence that- Wait, there's 16 prosecutions? Right. Well, Your Honor, it's not substantial evidence. When we look at that in the context of the whole picture, and the record shows that honor killings are more widespread than just those 16 prosecutions. And in addition to all the- I would guess that murders in this country are more widespread than actual prosecutions. That's true, Your Honor. Police can't always find the perpetrators, or they may know, or think they know who the perpetrators are, but the evidence may be insufficient to press a claim. That's true, Your Honor. But our State Department, in the State Department report that's in the record, characterized the sentences given to the few people who are prosecuted as token. That was the words of our State Department. And the record also shows that Jordanian police rarely investigate honor crimes, or take any initiative to deter them. The police are known for sympathizing with honor killers, and community treats these killers as heroes. But most significantly, the record demonstrates that local Jordanian officials will just stand by because of their inability and unwillingness to protect Sirotty specifically. When she went to the mayor and the police, they said, and I'm quoting here, there's nothing we can do about it. These are the traditions, and you've got to live with these traditions. You better handle it yourself. Your Honor, on page eight of the record, the BIA inexplicably found that this abuse was not- This was the mayor? Pardon? This was the mayor, right? And the local police. And the BIA inexplicably found that the abuse was not inflicted with the government's willful blindness. Yet, I think there's no better illustration of officials simply standing by. This was the board's only- How would this be different between a blood feud, let's say, between Hatfields and McCoys, so that if a McCoy knew that if he went back to his home state that the Hatfields would be out to get him? How would Cerati's case be different? No, how would that case be different from Cerati's case? I mean, is any time that we have a palpable threat of harm upon return to one's homeland or home state or whatever, does that constitute the acquiescence of officials? No, Your Honor. What we have here is a credible death threat, along with hundreds of pages of record evidence that establishes that this government stands by while numerous unreported honor killings are not prosecuted. The government does not make any attempt to investigate or deter these killings. Well, that's not entirely true. There have been prosecutions in Jordan. And the government has announced that it wishes to take some steps. The steps may not be as efficient as we would like, but the government has indicated that it would like to take steps to curb the practice of honor killings in Jordan. It may have, from a public relations standpoint, indicated that it would like to take steps, but based on this record evidence, the steps are not meaningful. And the IJ's entire finding of government acquiescence was based on a misreading of the State Department country report. The IJ incorrectly asserted that according to the State Department report, there were 16 total honor killings in 2008. That's on page 52 of the record. But the report on page 261 actually states that while the government prosecuted 16 reported honor killings, numerous additional unreported honor killings occurred. That may be true. Kelsey, do you want to give your partner a few minutes? I would, yes, thank you. Good morning. May it please the court, Ryan Ching for petitioner. Sorati testifies to the certainty that she will be killed by her husband or by her family. She describes the animalistic abuse suffered at the hands of her husband. Well, but that's not really a fact. That's a prediction. That's her subjective belief, which we must accept is true. We must draw all reasonable inferences from that. Well, no, no. It's, if she testifies as to a historical fact and there's no other scalability finding, we may be required or the agency may be required to accept her statement as true, but not when it comes to prediction. I mean, she may in fact, it may in fact be true that she believes she will be killed, but that does not mean we have to accept that she will in fact be killed. Well, on this record, we don't only have her credible testimony. We have, first of all, we have the statement, the fact that she testifies to the fact that her husband has threatened to kill her for bringing shame upon his name, for engaging in marital affairs, for leaving him, and for receiving the drug involvement crimes. And the IJ didn't find any different. Yes, but the IJ must consider all relevant evidence, all evidence relevant to the possibility of future torture. The IJ actually states on page 51 of the record, in his opinion, he states that she did not receive any threats, when in fact on page 306, she does report the fact that her husband has in fact threatened to kill her. Was there an adverse credibility finding made by the IJ? There was no adverse credibility finding. So we have to presume that you're speaking the truth. Yes, yes we do. Furthermore, all of her testimony is corroborated by the fact that the record evidence shows that the majority of the women that are receiving honor killings are having it for suspicion or for actual adultery. She's admitted to the adultery, and she says, she states, she testifies to the fact that her family and her community back in Jordan is aware of the fact that she's engaged in these extramarital affairs. And that is precisely the reason why she states that her husband or her family will kill her. So in addition to her testimony, there are also four areas below that the IJ and BIA relied upon. So you said page 51 is where the IJ makes that finding? Yes. Can you show me where? Okay. Starting at about six lines from the bottom, at the very end of the sentence, he says, in this regard, it is noteworthy that the respondent in the three years since her conviction has not reported that she received any threats from fellow narcotics traffickers, or from her family members, or from her ex-husband, indicating that they had intentions to harm her if she returned to Jordan. And on page 306. I'm sorry, what does it say that she, where does the IJ find she did not receive any threats? In the three years since her conviction. Which is what you said the IJ found. Yes. The IJ states right there, in the three years since her conviction, has not reported that she received any threats. But in fact, she did report it, because she reported it in her declaration on page 306. But that's quite different from saying, finding that she did not receive any threats. Which is what I thought you said. I see my time has run out. This is not moot court, you're gonna keep talking until we let you go. Okay? Certainly, thank you. I just want to understand what your point is. I think the point, I thought the point you were making is that the IJ found there was no threat, that she had not received any threats, when in fact she said she had. Yes. But the IJ doesn't make any findings at all as to whether she had or had not received. He talks about her having reported threats. Not reported threats in the sense of reported to the officials. It's reported in the sense that he states she has not reported that she received any threats. But in fact she does report through her declaration. Because the IJ had this full record available to him. And declaration is filed where? The declaration is on page 306. Or that's the piece of it. But isn't the IJ talking about reporting threats where he reports threats to the police rather than saying you have it, I mean this is a replication to the immigration authorities. That's not how I understand his phrasing. I believe in either regard, the fact that she has stated to the IJ that she received a threat, but the IJ does not take that into consideration. That in itself is an error. Because she states that she has received a threat. Does that require that we send this back for further credibility finding on that question? I believe it does require a remand because the IJ failed to consider all evidence relevant to the possibility of future torture. A threat is probably one of the most poignant points that we can have as to the possibility of future torture. Furthermore, we know that her husband is extremely abusive. He repeatedly raped, beat, and verbally abused her. And it resulted in severe injuries, two miscarriages. Do we know that he's back in Jordan? We know that he's back in Jordan, yes we do. She states that in her testimony. And what's the evidence that her family will harm her? The evidence that her family will harm her first is her own credible testimony when she states that her family will harm her. Additionally, we have the testimony of her brother. Was she specific or did she just say my family will harm me? She states it on page 209 and 210 when she's talking with the immigration judge. Okay, and what does she say? I don't have the exact quotation for you. Would you like me to look it up? Well, can you tell me, does she identify a brother or a father or an uncle? She just says her family in general. Okay, and presumably that does not mean her mother. I'm not confident that we can discount that. I think that would be making a presumption and I believe that part of what she relies upon, or rather part of what corroborates her testimony in the record is the fact that when her brother testified, he received a similar drug conviction but he didn't have the extra shameful acts. And when he returned home, his brother stabbed him. Then on a subsequent date, his brother saw him on the street and said, if I ever see you again, I will kill you. So we know that her family is very violent. We know that her family has this propensity for violence and we furthermore know that in this country, these women are killed. The State Department reports on page 261 and 262, that 25% of women that are honor killed are killed merely for a suspicion, a suspicion of adultery. We know that her family is aware of the adultery that she actually engaged in. Therefore, we can only, we must conclude that if they know this, the record compels a conclusion that she is going to be- When on 306, do you see her talking about the threat from her husband? You said 306, right? 306. So on page 306, the second paragraph, she says- The second, the first full paragraph? The first full paragraph, that's right. Okay. So, my estranged husband still considers me as his wife and found out about this relationship. He started to cause problems for my family. He accused them of bringing shame on his family and threatened that if my family did not cleanse the dishonor by killing me, that he would kill me in order to cleanse the shame. According to him, his reputation was tarnished and he was very, very angry and wanted revenge. This is consistent with the rest of the evidence that we have on the record, that these types of honor killings are communal, they're called for by the community, and they're based upon bringing shame to the family name. But here she is reporting something that was reported to her. I mean, this is not a threat directed at her. I mean, maybe against her, but it wasn't something that he said to her. That's correct. And who is the intermediary here? How does she know this? Well, she communicates that her husband, because he still considers her his wife, maintains contact with her family. That's on page 193 of the text. So, he says something to unknown members of his family. Presumably the mother, because he says that he maintains contact with the entire family. Well, we all know some unknown member of his family who then say to her, and she reports it. And do we then presume true what the unknown intermediary who does not testify before the IJA? I mean, she may in fact say this as, you know, somebody said this to me. But how do we know that the intermediary has reported fairly accurately what supposedly was said to them? So, I mean, we can't speculate as to what that is because you're correct that it's not directly in the record, but we do know that her son and her brother- So, we could accept her testimony as true, but this still would not put the threat in the husband's mouth, right? Okay, so even if we assume that the threat is not there, though the threat is there clearly in the declaration and must be considered, we consider her credible testimony that she fears being killed. Well, it's not a threat, but it is a statement from some unknown member of her family that the threat was made. Okay, we take the statement that the threat was made. We take her credible testimony that she believes she will be killed by her husband or by her family. And then we look at the evidence that her family and her husband are aware of the extramarital affairs she's engaged in. We know that she left her husband another act of shame. And we know that she got involved with this drug scene, another act of shame. The record supports the finding. I believe in at least in most of the articles that are in here that describe the honor killings, they describe it for these types of shameful acts, for either leaving the husband, for engaging in extramarital affairs. We also know that the family tried to kill her brother. They threatened to kill him. And we know that they stabbed him when he returned home for just the drug conviction. I don't believe that we have to look simply at the threat or simply at her credible testimony. We have that evidence. I was asking a slightly different question. If there's no adverse capability finding against her, we have to presume what she says is true. Right? But all we can get from that is that she truthfully tells us that some member of her family said something to her about a threat. We don't have a secondary presumption that the IJ has to find that that person was true or not true, right? She can honestly believe that she was told this and we can believe that fact, but that does not make it a threat. That just makes it a report by somebody in her family that that threat was made. That is correct. And that is not presumed true because of the absence of a credibility finding under the case law, right? That is correct. However, I would like to say that the allegation of the statement made is corroborated by the evidence on the record. Furthermore, we do know that under the stand- Right, and so if IJ had found it to be true, it would be supported by the record, but we have a situation where the IJ does not find it to be true. And the question is, is evidence such as compels a finding that in fact a real threat was made? That's the problem. We were getting, I don't believe that the IJ is necessarily discredited. The IJ states that she has not reported any received threats. Whether we want to characterize this as a threat or not, she reported the fact that someone has issued a threat, a statement that someone issued a threat. And the IJ does not give credence to this whatsoever, which violates the regulations, saying that the IJ has to consider all evidence relevant to the possibility of future torture. Then he doesn't have to believe all the evidence, right? He has to consider it. He must accept, because he did not find an adverse credibility finding, he must accept her testimony as true and draw all reasonable inferences from it. Okay, I think we understand your position. We'll hear from the government now. Thank you. Thank you. Morning, your honors. May it please the court. Sherry Glazer, appearing on behalf of the Attorney General. Your honors, this case involves a native and citizen of Jordan who fails to meet her burden to show deferral of removal, her eligibility for deferral of removal under the Convention Against Torture. Contrary to her argument, she simply shows that the, she fails to show that the record evidence compels the conclusion that it is more likely than not that she will be tortured upon her return to Jordan based on her U.S. drug conviction and fails to show that the record compels the conclusion that the government of Jordan would acquiesce in any honor killing that she believes would be committed against her. What weight should we give to the testimony of the brother that she would certainly be killed? Well, the immigration judge did not issue any adverse credibility finding against her brother, so we need to accept his testimony as true. However, there's no evidence, the record evidence does not compel the conclusion that the government of Jordan, if it was informed that she believes an honor killing would be committed against her, would not take steps to protect her. There are several sources in the record that indicate that the government of Jordan is prosecuting these cases, sentences are becoming tougher, and the government is placing women in protective custody if they find out that they believe something like an honor killing. That's a hard thing to swallow, that the women are either being placed in protective custody against their will by the government or are volunteering to be placed in protective custody as a way of insulating themselves against these honor killings. But what do we do with that? I have to say, I found that pretty astounding to find that we had women who had been in prison for, the record showed at least one woman had been in prison for 10 years. I think there's another allegation, maybe in the Human Watch report, of up to 20 years in protective custody. When they say protective custody, we weren't talking about being put in the Witness Protection Program. It looked like they were jailed. Well, the test under the Deferral of Removal against Convention Against Torture is not how the government protects these women, it's just whether the government protects these women, and if it's not the most comfortable way that the government perhaps could protect these women, the government is still protecting these women. Counsel, you said that the first thing, there was no evidence that the government was acquiescing in this, and your first point was the government was prosecuting these. I want to turn to the IJ's decision, on, it's page nine of the IJ's number of decisions. I've got page 77, it looks like there may be another copy someplace in the AR. But this is where the IJ says that there were 16 total honor killings in 2008. Now, the Petitioner's Counsel has cited to the record at AR 261, which is the State Department report, that says there were 16 prosecutions in 2008. Correct. Do you read that report to say there were 16 total honor killings in 2008? Well, there is substantial evidence in the record to indicate that only between 15 and 20 do occur each year, honor killings, on page 386. Although the State Department report itself, without attempting to corroborate, that says that the human rights groups have reported that numerous additional unreported cases likely occurred. What page is that on, I'm sorry? That's 261 of the State Department report. Correct. It's the very, very last line on the page. Activists reported that numerous, here's what it says. During the year, authorities prosecuted 16 reported instances of honor crimes that resulted in death of the victim, although activists reported that numerous additional unreported cases likely occurred. So the State Department doesn't accept or reject that, but the IJ's conclusion that there were 16 total honor killings is not supported by the record, is it? That is supported by the record. In the record on page 386, the newspaper reported that between 15 to 20 occurred each year. On page 336, it says 17 killings occurred in 2008. 422, 15 to 20 women were killed this way. 424 reports that- Oh, wait a minute. I'm sorry, you said 17 were in 2008? On page 336. Okay, but then why would he report that there were 16 in 2008? Perhaps the immigration judgment is read with the State Department- Okay. But the record evidence still compels the conclusion that between 15 and 20 occurred each year. At the very best, he's misstated the figure and it appears to understate what actually happened. There were 16 total prosecutions. Correct. And that is supported by the record. That is supported by the record. But it doesn't say that there were 16 total honor killings in 2008. No, there were 17, according to the record. And it shows that the government is not- And perhaps more, as the State Department report acknowledges. Perhaps more. There are sputterings in the record here and there that there may likely be more, but there's no- The record evidence still compels the conclusion that the number is listed in the record. Isn't the key figure not how many total killings there are or how many prosecutions, but how many known killings the government fails to prosecute? Correct. And there's nothing in the record to suggest there are known honor killings that the government failed to prosecute. The fact that there might be unknown killings out there, I mean, we have lots of unknown killings. I mean, we have lots of killings in this country where we never find a perpetrator, and the government can hardly be held responsible for- For prosecuting the unknown. For not prosecuting when they can't solve the crime, right? That's true. So is there any evidence in the record of known honor killings where the government failed to prosecute? No, there isn't any. That's really the key number, wouldn't it be? Not sort of the total number of killings, unknown or suspected, but the total number of known killings that are not prosecuted. And the record indicates that- As far as the record is concerned, how many of those are there? In 2008, total number of killings that have occurred? The total number of killings that are known but not prosecuted. There's no specific number in the record. There's nothing- No number at all, right? Correct. What weight do we give the Human Rights Report of 2008? What weight do we give it? Yes, what weight do we give it? There may be not a precise number, but they certainly say there are many, many, many honor killings taking place. They do say there are many more than what are reported, but I would like to point out that the Human Rights Watch report- It wasn't Human Rights Watch, it was the State Department 2008 Human Rights Report on Jordan. Oh, the State Department report. Yeah, there's quite a difference there. There is reported that perhaps the numbers are higher than between 15 and 20, but even though the record says there might be higher, the record evidence still compels the conclusion that the numbers are between 15 and 20. And in Pedro Mateo v. INS, this court has ruled that under the substantial evidence test, even if there are inconsistent conclusions that can be drawn from the record, the court must affirm the decision of the agency. But there are many consistent conclusions. I mean- I don't believe it's inconsistent. If we accept the fact that there are lots of, there may be any number of additional killings there, the government doesn't know about them or doesn't know who they are. Even the State Department didn't know for sure. They said whose spec there are. It's hard to prosecute something where your spec is a crime, but you don't have either an actual report of the crime or a criminal. Correct. And- Or, I mean, a criminal. Correct. As I've stated, there is- A identified suspect. Correct. Or what used to be called a criminal, the old days. Correct. Okay. All right, thank you. Okay, thank you. All right, Kasia Sawyer, you will stand submitted. I'd like to thank the UCLA students for their very able arguments. I thank both counsel, but we appreciate your appearing pro bono. Thank you. Our next case in the audio is Woods v. Adams.
judges: Kozinski, Nelson D. W., Bybee